**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Judy Lee Barker, | No. CV-16-0340-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,<br>Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 27). Defendant filed her Brief ("Response") (Doc. 36), and Plaintiff filed her Reply Brief ("Reply") (Doc. 42). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). *See* Compl. (Doc. 1). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

. . .

. . .

. . .

# I.     BACKGROUND

## A.     *Procedural History*

On November 29, 2011, Plaintiff filed a Title XVI application for Supplemental Security Income ("SSI") alleging disability as of September 22, 2011 due to osteoarthritis, PTSD, anxiety, panic, OCD, mood swings, low blood pressure, dizziness and balance problems, insomnia, osteopenia, high cholesterol, peptic ulcers, asthma, GERD, left foot skin problem, rosacea, and gastrointestinal problems. *See* Administrative Record ("AR") at 496, 498, 506, 543, 549–50, 561, 568–69, 644–46, 651, 687, 729. The Social Security Administration ("SSA") denied this application on May 7, 2012. *Id.* at 496, 543–60, 584–86. Plaintiff filed a request for reconsideration, and on February 5, 2013, SSA denied Plaintiff's application upon reconsideration. *Id.* at 496, 561–83, 588, 593–96. On March 11, 2013, Plaintiff filed her request for hearing. *Id.* at 496, 597-99, 100. On March 5, 2014, a hearing was held before Administrative Law Judge ("ALJ") Norman R. Buls. AR at 496, 517–42. On April 23, 2014, the ALJ issued an unfavorable decision. *Id.* at 493–510. On June 23, 2014, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on April 7, 2016, review was denied. *Id.* at 1–4, 293–94. On June 10, 2016, Plaintiff filed this cause of action. Compl. (Doc. 1).

## B.     *Factual History*

Plaintiff was fifty-one (51) years old at the time of the administrative hearing and forty-nine (49) at the time of the alleged onset of his disability. AR at 509, 549, 568, 584, 593, 650. Plaintiff has a tenth grade education and obtained a GED. *Id.* at 509, 521, 561, 651. Plaintiff does not have any past relevant work. *Id.* at 509.

## 1. Plaintiff's Testimony

### a. Administrative Hearing

At the administrative hearing, Plaintiff testified that she lives alone in an apartment. AR at 521. Plaintiff further testified that although she has a driver's license, she does not own a car, and rode the bus to the hearing. *Id*. at 521–22. Plaintiff also testified that she receives food stamps. *Id*. at 522. Plaintiff testified that she works seven (7) and one-half hours per week as a studio assistant at PSA Art Awakenings. *Id.* Plaintiff explained that PSA is a behavioral health agency, which assists people with substance use and mental health issues. *Id*. Plaintiff testified that as a studio assistant, she gets art supplies for the participants, and acts as peer support. AR at 522–23. Plaintiff described the work as similar to an internship. *Id*. at 522. Plaintiff testified that prior to working at PSA, she worked as a food demonstrator at Costco. *Id*. at 523. Plaintiff further testified that her physician, Dr. Schoenbaum, placed her on medical leave from that position, and she never returned. *Id*. at 523–24. Plaintiff testified that the pain from standing, neuropathy in her left arm, and pain in her neck were too much for her to be able to do the job. *Id*. at 524, 533.

Plaintiff admitted that she had ongoing methamphetamine addiction issues, but prior to her recent relapses had a year and seven months of sobriety. AR at 524–25. Plaintiff also testified that her addiction issues had prevented her from working consistently in the past. *Id.* at 525–28. Plaintiff testified that her ongoing neck pain, anxiety, and depression prevent her from working currently. *Id*. at 525.

Plaintiff described her average day as waking up at approximately 6:30 a.m., and

taking her dog out to the bathroom. *Id*. at 529. On Mondays, Plaintiff attends dialectical behavior therapy and meets with her individual therapist, after which she returns home to watch television or sleep. *Id*. Plaintiff testified that she works for approximately three (3) hours on Wednesdays and Fridays, and sometimes attends Narcotics Anonymous meetings. AR at 529. Plaintiff further testified that she attends other group health programs; works with someone named Abigail one hour once per week for budgeting; and her sister usually takes her grocery shopping, but she does not lift or carry anything. *Id*. at 529, 537–38. Plaintiff also testified that she does her laundry at the end of the hall where she lives, and is able to cook using the microwave or heating up canned soup. *Id*. at 529–30. Plaintiff testified that she has a dishwasher, does dishes and wipes the counters, and sprays cleaner in the bathroom. *Id*. at 530, 540. Plaintiff further testified that she does not have any friends, and has a son and daughter. *Id*. Plaintiff identified her hobbies as reading, painting, and Pinterest. AR at 533–34.

Plaintiff reported medication side effects of dry mouth, constipation, and dizziness. *Id*. at 534. Plaintiff described her neck hurts and she has been having migraines. *Id*. Plaintiff testified that she recently had injections for nausea and for pain, and she and her doctors were discussing injections for pain management of her neck. *Id*. at 534–35. Plaintiff attributed her headaches to her neck pain. *Id*. at 535–36. Plaintiff reported occasional anger resulting in scratching herself until she bleeds were pulling out her hair. AR at 536. Plaintiff further testified that she occasionally has problems dealing with people, and this can be affected by whether or not she is on her medication. *Id*. at 537. Plaintiff testified that she does not know how she managed the Costco job, but kept

her anxiety under control by talking constantly and quickly.  *Id*.  Plaintiff further testified that her impulsivity issues have caused financial problems, and she has previously been suicidal.  *Id*. at 540.

### b. Administrative Forms

On November 15, 2012, Plaintiff completed a Function Report—Adult in this matter.  She indicated that she lived with her husband in an apartment.  AR at 703, 720. Plaintiff described severe anxiety making it difficult for her to do her job, go to work, focus, and stay at work, as well as people and crowds adding to her stress.  *Id*.  Plaintiff further described that her back and neck pain also made it difficult to do activities, and she suffered from stress headaches.  *Id*.  Plaintiff described her day as waking up; needing to rest while getting dressed; taking pain and anxiety medication in order to work; and on days she was not working resting, watching television, and reading.  *Id*. at 704, 721.  Plaintiff does not care for any people, but does care for a pet, which includes feeding, taking her outside/walking, and sometimes brushing her.  *Id*.  Plaintiff stated that her husband helps her with their pet.  AR at 704, 721.  Plaintiff also noted that prior to her illnesses, she was more active and able to grocery shop and could do other tasks without pain and stress.  *Id*.  Plaintiff reported that she has trouble falling asleep, put ice on her neck several times, takes medication, but still wakes up frequently during the night and has difficulty going back to sleep.  *Id.*

Plaintiff reported difficulty lifting her arms; bending and reaching to put on clothes; difficulty washing her feet and lower legs; difficulty lifting her arms and reaching to take care of her hair; and needing to sit down to shave her legs.  *Id*. at 705,

722.  Plaintiff further reported her husband reminds her to take her medication, and she sets alarms.  *Id*.  Plaintiff reported preparing her own prepackaged meals every day, and can cook meals with her husband's help.  AR at 705, 722.  Plaintiff stated she washes dishes and does light housework, but her husband helps her.  *Id*. at 706, 723.  Plaintiff reported that she goes out every day using public transportation, because she does not drive.  *Id*.  Plaintiff further reported going to the grocery store twice a week, but her husband and daughter help her with the cart and with carrying.  *Id*.

Plaintiff stated that she is able to pay bills, count change, handle a savings account, and use a checkbook or money orders.  *Id*. at 707, 724.  Plaintiff stated that she reads, watches television, and goes to church, but does not go out as much.  AR at 707, 724.  Plaintiff's social activities include going to church twice per week, although she does not stay to socialize.  *Id*.  Plaintiff's social activities include only church and family.  *Id*.

Plaintiff reported that her illnesses affect his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others.  *Id*. at 708, 725.  Plaintiff estimated that she can walk for approximately one to one and a half blocks before needing to rest, and requires five (5) minutes of rest before she can resume walking.  *Id*.  Plaintiff further reported that neck and back pain affect her movement, and anxiety and stress affect her ability to think and remember.  AR at 708, 725.  Plaintiff also noted that she sometimes has trouble finishing what she starts, following written instructions, and following spoken instructions.  *Id*.  Plaintiff reported that she does not handle stress or

changes in routine well, and has unusual fears regarding her health, medications, and work. *Id*. at 709. Plaintiff indicated that she requires glasses daily, and uses a rolling cart to assist in carrying items. *Id*. Plaintiff also completed a Work History Report; however, the ALJ's finding that Plaintiff has no past relevant work obviates the need for this report. *Id.* at 712–19.

The record also contains a second, undated, Function Report—Adult completed by Plaintiff. She indicated that she lived alone in transitional housing. AR at 674. Plaintiff stated she misses a lot of work due to physical issues including back pain, low blood pressure, ear infections, allergies, lung infections, osteoarthritis, and severe headaches, as well as mental health issues including anxiety, mood swings, depression, and obsessions. *Id*. Plaintiff described her day as obsessing about leaving her dog, what she has to do for the day, her stove, and her health; worrying if she is going to make it to the day at work; taking her medications; breakfast; showering depending on her mood; attending groups as scheduled or needed; stressing about the bus and about being on time; stressing about losing her job if she does not make it; being emotionally and physically drained after group therapy; eating; and going to bed. *Id*. at 675. Plaintiff does not care for any people, but does care for a therapy pet, which includes feeding and watering her, taking her outside and for short walks. *Id*. Plaintiff also noted that prior to her illnesses, she was able to work, lift more, walk more, stand more, and breathe better. *Id*. Plaintiff reported that she has insomnia, back pain, anxiety, obsessions, racing thoughts, and headaches. AR at 675.

Plaintiff reported difficulty putting on pants, socks, and shoes; difficulty washing

her feet and lower legs; shaving her legs results in back pain; and difficulty lifting a gallon of milk. *Id*. at 676. Plaintiff further reported that COPE staff remind her to take her medication, and she sets alarms. *Id*. Plaintiff reported preparing her own peanut butter and jelly sandwiches, cereal, oatmeal, or frozen meals every day, but further noted that she is sometimes too tired to cook or eat. *Id*. Plaintiff stated she washes dishes and does laundry, waters plants, and sweeps the floor. *Id*. at 677. Plaintiff reported that she goes out almost every day using public transportation, because she does not drive. AR at 677. Plaintiff further reported going to the grocery store and thrift store once or twice a week. *Id*. Plaintiff stated that she is able to pay bills, count change, and use a checkbook or money orders, but she is unable to handle a savings account. *Id.* at 678. Plaintiff stated that she reads, watches television, and paints. *Id*. Plaintiff reported going to church, as well. *Id.*

## 2. Lay Witness Testimony

### a. Shawna Thompson

On March 21, 2012, Shawna Thompson, Plaintiff's friend, completed a Function Report—Adult—Third Party. AR at 679–86. Ms. Thompson reported that she had known Plaintiff for a little over a year, and sees her two (2) to three (3) hours per week. *Id*. at 679. Ms. Thompson further reported that Plaintiff lives alone in a behavioral health housing apartment. *Id.* Ms. Thompson stated that Plaintiff walks her dog; checks in with staff; goes back and forth to the office; attends bible study and church some days; and works two (2) days per week at Costco, but will "lose her job if she messes up one more time." *Id*. Ms. Thompson reported that Plaintiff feeds and walks her dog, as well as

brushes her and talks to her. *Id*. at 680. Ms. Thompson further reported that Plaintiff has difficulty making decisions, because her thoughts are all over the place and she is in constant pain. AR at 680. Ms. Thompson also reported that Plaintiff cannot sleep, because her mind races. *Id*. Ms. Thompson further noted that Plaintiff's racing thoughts, as well as pain, wake her up. *Id*. Ms. Thompson stated that Plaintiff "use[d] to dress carefully[,] but now does not care so much[;] . . . [w]hen she is depressed or thinking too much she can't bathe[;] . . . [Plaintiff] will miss meals when she is manic or in pain[;] . . . [s]he gets trapped on the toilet when her back hurts[;] . . . [and] [s]he misses work when she is in pain." *Id*. Ms. Thompson reported that staff at the apartment will remind Plaintiff to shower and ask if she has taken her medication. *Id*. at 681. Ms. Thompson also reported that Plaintiff can prepare prepackaged meals and canned food, and eats daily. AR at 681. Ms. Thompson further reported that "[i]t may take [Plaintiff] an hour to get a sandwich together because she gets distracted." *Id*. Ms. Thompson also observed that Plaintiff used to cook complete meals, but cannot stand long enough to do so now. *Id.*

Ms. Thompson reported that Plaintiff cleans her apartment once per week, and does laundry every two weeks, but it takes her all day to accomplish these tasks. *Id.* Ms. Thompson reiterated that Plaintiff is easily distracted by her thoughts and pain. *Id*. Ms. Thompson noted that Plaintiff lives in a behavioral health housing apartment, so does not need to do yardwork. AR at 682. Ms. Thompson observed that Plaintiff will go outside at least twice per day to take her dog out, but depending on how depressed she is will isolate. *Id*. Ms. Thompson reported that Plaintiff walks and uses public transportation,

but will not drive.  *Id.*  Ms. Thompson further reported that Plaintiff goes to the store for groceries approximately every two weeks.  *Id*.  Ms. Thompson reported that Plaintiff is able to pay bills and count change, but is not able to handle a savings account or use a checkbook.  *Id.*  Ms. Thompson observed that Plaintiff is now more impulsive with her money.  AR at 683.

Ms. Thompson reported that Plaintiff likes to paint and goes to Art Awakenings, a part of her mental health services, to do so.  *Id.*  Ms. Thompson further reported that Plaintiff goes to Art Awakenings once every three (3) weeks "or so[,] depending on her mood."  *Id.*  Ms. Thompson noted that Plaintiff "used to be very creative[,] but it is hard for her to be still because of her back pain."  *Id.*  Ms. Thompson reported that for social interaction Plaintiff checks in with staff and makes phone calls to friends.  *Id.*  She also reported that Plaintiff goes to church once per week, and people from the church visit her for bible study.  AR at 683.

Ms. Thompson reported that when Plaintiff is in pain "she can be very angry and hurtful."  *Id.* at 684.  Ms. Thompson also stated that when Plaintiff is manic she is impulsive.  *Id.*  Ms. Thompson reported that Plaintiff's illnesses affect her ability to lift; squat; bend; stand; reach; walk; sit; kneel; talk; climb stairs; remember; complete tasks; concentrate; understand; follow instructions; and get along with others.  *Id.*  Ms. Thompson further reported that Plaintiff can walk approximately one hundred yards, and sometimes need to rest for several minutes before she can walk again.  *Id.*  Ms. Thompson indicated that Plaintiff could only pay attention for approximately five (5) minutes.  AR at 684.  Ms. Thompson also reported that Plaintiff does not follow written

or spoken instructions well. *Id.* Ms. Thompson noted that Plaintiff does not get along well with authority figures, or handle stress or changes in routine well. *Id.* at 685. Ms. Thompson further noted that Plaintiff is often "on warning" at work because of these issues. *Id.* Ms. Thompson reported that Plaintiff wears glasses or contact lenses every day. *Id.* Ms. Thompson further reported that Plaintiff "has been sober for three months since her last relapse[,] [and] is in constant pain and this plus her bipolar makes her difficult to be around." AR at 686. Ms. Thompson also stated that Plaintiff seems unable to change this behavior, and is impulsive, anxious, and constantly has negative thoughts. *Id.* Ms. Thompson observed that Plaintiff's "mental illness with her physical disability make it difficult for her quality of life." *Id.*

### b. Jay Clevenger

On November 13, 2012, Plaintiff's then-husband, Jay Clevenger, completed a Function Report—Adult—Third Party. AR at 695–702. Mr. Clevenger reported that he had known Plaintiff for six years. *Id.* at 695. Mr. Clevenger further reported that he and Plaintiff lived together in an apartment. *Id.* Mr. Clevenger described Plaintiff's average day as "[d]aily activities [and] work[.]" *Id.* Mr. Clevenger reported that Plaintiff feeds, gives water to, and walks her dog. *Id.* at 696. Mr. Clevenger further reported that Plaintiff was more active and energetic before her illness, but now has difficulty relaxing and falling asleep due to severe neck and back pain, as well as her medication. AR at 696. Mr. Clevenger did not note any problems with Plaintiff's personal care. *Id.* Mr. Clevenger indicated that he helps remind Plaintiff to do things, including taking her medication. *Id.* at 697. Mr. Clevenger reported that Plaintiff could prepare "basic

meals." *Id.* Mr. Clevenger further reported that she did basic house cleaning *Id.*

Mr. Clevenger noted that Plaintiff would go out daily as needed, and used public transportation, but did not drive. AR at 698. Mr. Clevenger reported that Plaintiff shopped for groceries in stores. *Id.* Mr. Clevenger also reported that Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook/money order. *Id.* Mr. Clevenger reported that Plaintiff previously enjoyed arts and crafts, but no longer had "interest or energy because of back pain." *Id.* at 699. Mr. Clevenger further reported that Plaintiff went to church and had bible studies at home, twice per week. *Id.* Mr. Clevenger stated that Plaintiff did not participate in any other social activities. AR at 700. Mr. Clevenger also stated that Plaintiff's illnesses affect her ability to lift; squat; bend; stand; reach; walk; sit; kneel; climb stairs; complete tasks; concentrate; understand; and use her hands. *Id.* Mr. Clevenger further reported that "back pain affects [Plaintiff's] physical duties, while SMI affects mental capacities." *Id.* Mr. Clevenger indicated that Plaintiff could follow written or spoken instructions depending on what was on her mind. *Id.* Mr. Clevenger noted that Plaintiff gets along "very well" with authority figures, but does not do well with stress. *Id.* at 701. Mr. Clevenger also reported that Plaintiff takes longer for daily activities; has trouble sleeping and often wakes up feeling badly; and climbing the stairs to their apartment is taxing. *Id.* at 702.

### 4. Plaintiff's Medical Records

#### a. Physical issues

On September 29, 2011, Plaintiff saw her primary care physician, David Schoenbaum, M.D., complaining of muscle spasms in her back. AR at 1065. That same

date, Plaintiff underwent imaging studies of her lumbar spine and sacroiliac joints. *Id.* at 1066–67. Roy McDaniel, M.D. read the studies and reported "[n]ormal alignment of the five lumbar vertebrae[;] [m]oderately severe disc space narrowing at L3-4 and mild-to-moderate narrowing at L4-5 and L5-S1[;] [l]argest osteophytes are at the L3-4 level including anterior and posterior osteophytes[;] [and] [m]ild facet arthrosis L4 through S1." *Id.* On November 1, 2011, Plaintiff was seen by Dr. Schoenbaum and complained of dizziness and nausea. *Id.* at 1059. On November 22, 2011, Plaintiff returned to Dr. Schoenbaum, again complaining of dizziness and nausea. *Id.* at 1060.

On May 18, 2012, followed up with FNP Smith after an emergency department visit regarding her severe left arm pain and cervicalgia. AR at 1081. On May 29, 2012, Plaintiff was seen by Steven A. Shapiro, M.D. regarding numbness and tingling in her left ring and little fingers, as well as pain radiating from her neck down to her fingers. *Id.* at 927–928. Dr. Shapiro reported Plaintiff to have "painful[,] restricted range of motion of her cervical spine and Spurling's maneuver could not be performed." *Id.* Dr. Shapiro further reported that "[t]he patient does have pain with shoulder range of motion and it does have signs of impingement although everything hurts and goes numb when moving her shoulder[;] [s]he has a negative Tinel's of the ulnar nerve in the cubital tunnel area and median nerve at the pronator area and over the carpal tunnel[;] [t]here is no distal atrophy but she does have significant weakness of her ulnarly innervated intrinsics." *Id.* Dr. Shapiro recommended an MRI. *Id.* at 928. On May 30, 2012, Plaintiff followed up with Dr. Schoenbaum. AR at 1082.

On July 3, 2012, Plaintiff had a magnetic resonance imaging ("MRI") of her

cervical spine taken. *Id.* at 923–24, 1106–07. Gerard K. Jeong, M.D., FACS, noted that the MRI "demonstrate[d] multilevel cervical disc disease from C3-T1[,] [with] . . . more significant degenerative changes at C5-6 and C6-7[;] [m]ild C3-4 cervical spondylolisthesis[;] . . . moderate C5-6 central stenosis and moderate to severe bilateral C5-6 foraminal stenosis secondary to a disc osteophyte complex[;] [t]here is left worse than right C6-7 foraminal stenosis[;] [and] [t]here does appear to be evidence of a fairly significant left C7-T1 cervical disc herniation which does extend into the left C7-T1 foramen." *Id.* at 923, 1106. Dr. Jeong further noted that Plaintiff's imaging study showed "a loss of cervical lordosis[;] [o]verall straightening of the cervical spine[;] [m]ild C3-C4 spondylolisthesis[;] [and] [s]evere spondylotic changes particularly from C5-C7." *Id.* Dr. Jeong's impressions included left C8 radiculopathy; C7-T1 herniated nucleus pulposus and left foraminal stenosis; multilevel cervical disc disease; moderate C5-6 central/foraminal stenosis; and cervical spondylolisthesis C3-4. *Id.* On August 21, 2012, Plaintiff was given a nerve root injection of her Left C8. AR at 929–30, 1112–13. On October 19, 2012, Plaintiff saw Dr. Schoenbaum and reported ongoing left side numbness and pain. *Id.* at 1090.

On March 29, 2013, David Schoenbaum, M.D. imposed restrictions on Plaintiff's work, including frequent breaks to stretch and change positions; no repetitive lifting greater than four (4) pounds; and no crouching, crawling, pushing, or pulling. *Id.* at 975. On April 17, 2013, Dr. Schoenbaum noted Plaintiff's chronic c-spine pain. *Id.* at 1097. On May 22, 2012, Dr. Shoenbaum provided Plaintiff a medical excuse from work lasting from April 8, 2013 through October 8, 2013. *Id.* at 976.

On March 15, 2013, Plaintiff was seen by Merri L. Miller, PA-C at Tucson Orthopaedic Institute for a follow-up. AR at 1004–05, 1114–15. Plaintiff reported continued neck pain, as well as headaches, and continued left thumb symptoms. *Id.* at 1004, 1114. PA Miller prescribed another left C8 injection, but emphasized the need for physical therapy. *Id.* On April 11, 2013, Plaintiff had another left C8 nerve root injection. *Id.* at 1116–17. On May 10, 2013, Dr. Schoenbaum wrote a work release for Plaintiff, indicating that she was unable to work full time due to "Reactive Lung Disease, orthostatic hypotension which may cause syncope and spinal stenosis which is painful." *Id.* at 1126.

On August 29, 2013, Plaintiff was seen by Nicole Stoker, P.A.-C. at Tucson Orthopaedic Institute for lumbar pain. AR at 1119–22. PA Stoker assessed acute onset of right-sided lower extremity radiculopathy and mild lumbar spondylosis L3-L4. *Id.* at 1121. A conservative treatment course including exercise and anti-inflammatories was chosen, as this was a new issue. *Id.* On September 24, 2013, Plaintiff returned to Tucson Orthopaedic Institute for a follow-up. *Id.* at 1123. Plaintiff's MRI of her lumbar spine, taken on September 11, 2013, showed multilevel lumbar disc disease from L3-S1, and disc bulging at L3-4, L4-5, and L5-S1. *Id.* at 1121, 1128. Dr. Jeong noted that this represented "significant multilevel lumbar disc disease from L3-S1." AR at 1121. On November 4, 2013, Plaintiff was seen at Tucson Orthopaedic Institute by Andrew Mahoney, M.D. regarding right hip pain. *Id.* at 1131–32. Plaintiff was noted to be receiving physical therapy for her lumbar spine, and Dr. Mahoney opined that continued physical therapy was appropriate. *Id.* at 1132.

On December 3, 2013, Plaintiff followed up with Dr. Jeong regarding her on-going neck pain. *Id.* at 1133–34, 2799. Dr. Jeong reported his impression of persistent left C8 radiculopathy and multilevel cervical spondylosis. *Id.* at 1133, 2799. On December 24, 2013, Plaintiff underwent another MRI study of her cervical spine. AR at 1136–1137, 2801–02, 2803–05, 2806–07. David T. Jeck, M.D. compared the images to her June 6, 2012 study and found some cervical spine straightening; a patent craniocervical junction; no canal or foraminal narrowing at C2-3; Grade I anterolisthesis present at C3-4 with some facet degenerative joint disease, greater on the right than left, uncovertebral spurring present, moderate-to-severe right foraminal narrowing and mild-to-moderate left foraminal narrowing likely unchanged compared with the prior exam; minimal disc bulging at C4-5, but some face degenerative joint disease; some degenerative disc disease at C5-6, with uncovertebral disc osteophyte complex present bilaterally with severe bilateral foraminal narrowing, mild-to-moderate canal narrowing with posterior disc osteophyte, greater to the right than the left likely similar to prior exam; some degenerative disc disease present at C6-7, some uncovertebral disc osteophyte complex present, mild-to-moderate foraminal narrowing present bilaterally; mild disc bulging at C7-T1, although previously left paracentral disc herniation is nearly completely resolved; and mild disc bulging at T2-3 through T4-5. *Id.*

On January 28, 2014, Plaintiff followed-up with Dr. Jeong post left C8 selective nerve root injection. *Id.* at 2812–13. Dr. Jeong's impression included persistent left C8 radiculopathy/radiculitis, multilevel cervical disc disease C3-C7, and foraminal stenosis C5-6 worse than C6-7. *Id.* at 2812. Dr. Jeong further noted that Plaintiff's "findings do

appear to be consistent with a left C8 radiculopathy/radiculitis." *Id.* On February 17, 2014, Plaintiff saw Scott Goorman, M.D. regarding pain management. AR at 2814–17. Dr. Goorman noted Plaintiff's "good amount of axial neck pain but also some radicular symptoms which may be consistent with her bilateral C6 radiculopathy/foraminal narrowing. *Id.* at 2817. Dr. Goorman suggested bilateral C6 selective nerve root blocks. *Id.* On March 14, 2014, Dr. Schoenbaum wrote a letter noting her osteoarthritis of the right hip, multilevel cervical spinal stenosis causing pain and headaches, lumbar pain, reactive lung disease, orthostatic hypotension, severe depression, and anxiety. *Id.* at 2819. Dr. Schoenbaum further noted that Plaintiff's orthostatic hypotension has caused some syncope at times, and she should avoid ladders, climbing and being around machinery. *Id.* Dr. Schoenbaum also noted that Plaintiff becomes short of breath when walking or climbing stairs with her reactive lung disease. AR at 2819. Dr. Schoenbaum opined that he would expect Plaintiff to miss three (3) to four (4) days per month based on her chronic pain and exacerbations thereof, and that she should avoid any activity that requires her neck to be either in a downward or upward position for any length of time. *Id.* Dr. Schoenbaum also noted that her headaches likely arise from her cervical spine issues, and require her to lie down occasionally in a dark room for two (2) to three (3) hours to alleviate her symptoms. *Id.*

### b. Mental health issues

Plaintiff's medical records demonstrate that between July 2008 and May 2014, Plaintiff had contact with COPE behavioral health staff on 907 days. *See* AR at 1330–2797, 2864–2972. On some days, Plaintiff's contact was simply a check-in with staff

members; however, on other days Plaintiff had multiple contacts, including extensive time spent in one-on-one therapy, group therapy, and dialectical behavior therapy. The records also note Plaintiff's participation in Intensive Outpatient Therapy; however, there do not appear to be records regarding where this occurred. *See, e.g.,* AR at 1930, 2204. Plaintiff's diagnoses include Posttraumatic Stress Disorder, polysubstance dependence, panic disorder without agoraphobia, bipolar II disorder, obsessive-compulsive disorder, major depressive disorder recurrent unspecified, adjustment disorder, and borderline personality. On June 27, 2012, Plaintiff was determined to be seriously mentally ill ("SMI"). AR at 918–19. Plaintiff's principal diagnosis underlying this finding was posttraumatic disorder, and her GAF score at that time was 55. *Id.* Moreover, Plaintiff was determined to have a major disruption of role functioning. *Id.* at 919. Role functioning is Plaintiff's capacity to perform the present major role function in society— school, work, parenting or other developmentally appropriate responsibility. *Id.* Plaintiff's medications include citalopram, hydroxyzine pamoate, fludrocortisone, Butrans patch, gabapentin, tizanidine, Advair Diskus, and omeprazole. *Id.* at 2838, 2969–70, 2987–92.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's

findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

## III. ANALYSIS

### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the

claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjustment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff was not engaged in substantial gainful activity since her application date of November 29, 2011. AR at 498. At step two of the sequential evaluation, the ALJ found that "[t]he claimant has the following severe impairments: cervical disc disease, orthostatic hypotension, and asthma." *Id.* At step three, the ALJ found that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." *Id.* at 506. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) with the following limitations: lift and/or carry twenty-five pounds occasionally and ten (10) pounds frequently; sit, stand or walk for up to six hours each in an eight-hour day; no balance limitations for ordinary ambulation; occasionally stoop and crawl; frequently kneel,

crouch and climb ramps or stairs; never climb ladders, ropes or scaffolds; should avoid concentrated exposure to temperature extremes and humidity; should avoid concentrated exposure to respiratory irritants; and should not work at unprotected heights[;] [and] [t]he claimant has no mental limitations." *Id.* at 506. At step four, the ALJ found that "there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a))." *Id.* at 509. Accordingly, the ALJ determined that Plaintiff was not disabled. AR at 510.

Plaintiff asserts that the ALJ erred in failing to properly evaluate and consider the 1) opinions of Plaintiff's treating providers and the medical evidence; 2) statements and observations by lay persons and others; 3) credibility of Plaintiff; and 4) need for a vocational expert. Pl.'s Opening Br. (Doc. 27) at 1, 21–37.

### B. Treating Physician Opinions

Plaintiff asserts that the ALJ's reliance on consultative examiner Timothy A. Raissain, M.D. was legally erroneous. Pl.'s Opening Br. (Doc. 27) at 21–25.

### 1. Legal Standard

"As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996) (citing *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987)); *see also Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014). "The opinion of a treating physician is given deference because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'" *Morgan v. Comm'r of the SSA*, 169 F.3d 595, 600 (9th Cir. 1999) (quoting *Sprague v. Bowen*, 812 F.2d 1226, 1230

(9th Cir. 1987) (citations omitted)). "The ALJ may not reject the opinion of a treating physician, even if it is contradicted by the opinions of other doctors, without providing 'specific and legitimate reasons' supported by substantial evidence in the record." *Rollins v. Massanari*, 261 F.3d 853, 856 (9th Cir. 2001) (citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *see also Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007); *Embrey v. Bowen*, 849 F.2d 418, 421 (9th Cir. 1988). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Embrey*, 849 F.2d at 421 (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Moreover, "[e]ven if a treating physician's opinion is controverted, the ALJ must provide specific, legitimate reasons for rejecting it." *Id.* (citing *Cotton*, 799 F.2d at 1408). Additionally, "[a] physician's opinion of disability 'premised to a large extent upon the claimant's own account of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'" *Morgan*, 169 F.3d at 602 (quoting *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citations omitted)). "Similarly, an ALJ may not simply reject a treating physician's opinions on the ultimate issue of disability." *Ghanim v. Colvin*, 763 F.3d 1154, 1161 (9th Cir. 2014). "[T]he more consistent an opinion is with the record as a whole, the more weight we will give to that opinion." 20 C.F.R. § 404.1527(c)(4).

### 2. David Schoenbaum, M.D.

The ALJ chose to rely on a consultative examiner because he "is an orthopedic specialist who personally examined the claimant and because his assessment is well

- 22 -

supported by his clinical findings and the objective findings of record." AR at 508. "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctor's are correct." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (citations omitted). Furthermore, "[t]he ALJ is required to consider the factors set out in 20 CFR § 404.1527(c)(2)-(6) in determining how much weight to afford the treating physician's medical opinion." *Ghanim*, 763 F.3d at 1161; *Garrison*, 759 F.3d at 1012 n. 5. The record demonstrates that the ALJ's "specific and legitimate" reasons for his dismissal of Dr. Schoenbaum's opinions are not supported by "substantial evidence in the record". *See, e.g., Rollins*, 261 F.3d at 856.

Dr. Schoenbaum was Plaintiff primary care physician for several years, and as such had an ongoing treatment relationship with her. First, the ALJ challenges Dr. Schoenbaum's March 2013 restrictions, because they did not last the requisite twelve months. AR at 508. Although that specific work release was limited to a six (6) month period, the reason for Dr. Schoenbaum's restrictions, Plaintiff's cervicalgia, continued on well past the requisite twelve months, and is well documented by Dr. Schoenbaum and Dr. Jeong, both of whom treated Plaintiff.

The ALJ also asserts that Plaintiff's activities of daily living undermine Dr. Schoenbaum's opinion. AR at 509. The Ninth Circuit Court of Appeals has "repeatedly warned[, however,] that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759

F.3d at 1016 (citations omitted).  Furthermore, "[t]he Social Security Act does not require that claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication."  *Smolen*, 80 F.3d at 1287 n. 7 (citations omitted).  The Ninth Circuit Court of Appeals has noted:

> The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer.  The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.

*Garrison*, 759 F.3d at 1016 (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)) (alterations in original).  Plaintiff's medical records demonstrate that although she is able to leave her house and participate in church and therapy, she does not have the ability to maintain any more than a de minimis level of employment.  As such, the ALJ's finding is unsupported.

The ALJ notes Plaintiff's improved disc herniation at C7-T1, yet fails to acknowledge the severe issues remaining from C3-6.  The ALJ further points to Plaintiff's conservative medical treatment; however, receiving nerve root injections cannot be considered conservative.  Furthermore, the ALJ does not point to a treatment option that was presented, yet dismissed by Plaintiff.  Finally, the ALJ dismisses Plaintiff's headaches as unsupported, despite the fact that they are mentioned throughout Dr. Schoenbaum's and Tucson Orthopaedic's records, as well as in Plaintiff's COPE records.  The ALJ's failure to give Dr. Schoenbaum's opinions significant weight was

legal error.

### 3. Mental health providers

Regarding Plaintiff's mental health treatment the ALJ stated:

> [T]he medical consultants who reviewed the claim at the request of the State Agency, Jaine Foster-Valdez, Ph.D., and Stephen Bailey, Ed.D., concluded the claimant had no severe mental impairment. They found her affective disorder, anxiety-related disorder, and substance addiction disorders did not impose more than mild limitations in any area of mental functioning (Exs. 4A/10, 2A/6). The undersigned gives the opinions considerable weight because they are well supported by the mental status findings which were generally intact and by the claimant's self-admitted daily activities.

AR at 509. The ALJ can meet th[e] burden [of providing specific and legitimate reasons supported by substantial evidence] by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Trevizo v. Berryhill*, — F.3d —, 2017 WL 4053751, *7 (9th Cir. Sept. 14, 2017) (citations omitted). Moreover, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion [of] an examining physician." *Buck v. Berryhill*, — F.3d —, 2017 WL 3862450, *6 (9th Cir. Sept. 5, 2017) (citations omitted).

Furthermore, the Ninth Circuit Court of Appeals has recently acknowledged:

> [T]he report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology. . . . Psychiatric evaluations may appear subjective, especially compared to evaluation in other medical fields. Diagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry. *See Poulin [v. Bowen]*, 817 F.2d [865,] 873 [(D.C. Cir. 1987)] ("Unlike a broken arm, a mind cannot be x-rayed."). Thus, the rule allowing an ALJ to reject opinions based on self-reports does not apply in the same manner to opinions regarding mental illness.

*Buck*, 2017 WL 3862450 at *6.  The medical records demonstrate that Plaintiff's serious mental illness creates severe challenges in her life.  Moreover, mental status findings that are "generally intact" is no more than a single, superficial, conclusory statement that does not represent a specific and legitimate reason supported by substantial evidence.  Although Plaintiff may be able to provide peer support as an Recovery Support Specialist ("RSS") and she is not limited to lying in bed all day or institutionalized, does not mean that she can handle the stress and requirements of a work situation.  *See Garrison*, 759 F.3d at 1017, n.22 ("individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms[;] [s]uch individuals may be much more impaired for work than their signs and symptoms would indicate").

### C.     *Remand for Further Proceedings*

"'[T]he decision whether to remand the case for additional evidence or simply to award benefits is within the discretion of the court.'"  *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir. 1989) (*quoting Stone v. Heckler,* 761 F.2d 530, 533 (9th Cir. 1985)).  "Remand for further administrative proceedings is appropriate if enhancement of the record would be useful."  *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004) (*citing Harman v. Apfel,* 211 F.3d 1172, 1178 (9th Cir. 2000)).  Conversely, remand for an award of benefits is appropriate where:

> (1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Benecke,* 379 F.3d at 593 (citations omitted).  Where the test is met, "we will not remand solely to allow the ALJ to make specific findings. . . . Rather, we take the relevant testimony to be established as true and remand for an award of benefits." *Id.* (citations omitted); *see also Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995).  "Even if those requirements are met, though, we retain 'flexibility' in determining the appropriate remedy." *Burrell v. Colvin*, 775 F.3d 1133, 1141 (9th Cir. 2014).

Here, the ALJ committed legal error in discounting Plaintiff's treating physician's opinion, and rejecting treating mental health professionals.  The Court finds that the record is well developed, and no outstanding issues must be resolved before a determination of benefits can be made.  The Court further finds that it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.  Additionally, in light of the ALJ's clear error with regard to Plaintiff's treating physicians, the Court declines to further analyze his treatment of the lay witness testimony and Plaintiff's symptom testimony.

## V. CONCLUSION

Based upon the foregoing, the Court REVERSES the ALJ's decision and the case is REMANDED for further proceedings consistent with this decision.

Accordingly, IT IS HEREBY ORDERED that:

1)      Plaintiff's Opening Brief (Doc. 27) is GRANTED;

2)      The Commissioner's decision is REVERSED and REMANDED for calculation and award of benefits. 42 U.S.C. § 405(g); and

4)     The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 29th day of September, 2017.

_____
Honorable Bruce G. Macdonald
United States Magistrate Judge